UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KENIA ROBINSON**,                              Case No. 1:12 CV 531

        Plaintiff,                         Judge Benita Y. Pearson

    v.                                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

       Defendant.                         Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Kenia Robinson ("Plaintiff"), proceeding *pro se*, seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated March 5, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision denying benefits.

### BACKGROUND

Procedural History

In October 2008, Plaintiff filed an application for Supplemental Security Income, alleging disability since September 30, 2008. (Tr. 109-11). The claim was denied initially on March 18, 2009 and on reconsideration July 21, 2009. (Tr. 90-94, 98-100). Plaintiff then requested an administrative hearing. Born April 30, 1975, Plaintiff was 35 years old at the time of the hearing held on September 8, 2010. Following the hearing, at which Plaintiff, her then-attorney, and a vocational expert ("VE") appeared (Tr. 30-68), an administrative law judge ("ALJ") found Plaintiff

not disabled (Tr. 13-29).  The Appeals Council denied Plaintiff's request for review (Tr. 1-6), making the ALJ's September 2010 hearing decision the final decision of the Commissioner. 20 C.F.R. §§ 416.1455, 416.1481.  In her Brief on the Merits, Plaintiff only challenges the ALJ's conclusions on her mental impairments (*see* Doc. 12), and therefore waives any claims regarding the ALJ's determinations regarding physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver).  Therefore, the Court addresses only pertinent mental health records below.

Vocational History

Plaintiff graduated from high school and attended some college. (Tr. 34-35). Her vocational history includes jobs in customer service and as a home health aid, licensed cosmetologist and bank teller. (Tr. 34, 39).  Just prior to her application, she worked as a daycare provider, but a counseling report from Plaintiff's supervisor at the YMCA, dated September 30, 2008, indicated Plaintiff fell asleep at work or left children unattended on numerous occasions.  (Tr. 231).  The supervisor characterized Plaintiff as "a nice person," but did not think she was suited for this particular job. *Id.*  Since applying for disability benefits, Plaintiff has applied for several customer service and secretarial positions. (Tr. 48-49).

Medical History

In May 2008, Plaintiff saw Dr. Phillips, a psychologist at the University of Akron's Counseling, Testing and Career Center in May of 2008 for learning disability evaluation.  (Tr. 168-70).  Intelligence testing revealed low-average to average intelligence. (Tr. 169). Dr. Phillips indicated the results did not support a diagnosis of a specific learning disorder.  (Tr. 170).  He estimated Plaintiff's current Global Assessment of Functioning ("GAF") score as 55 and her

long-term GAF as 80.  *Id.*[1]  In August 2008, Plaintiff went to her primary care physician Dr. Bouchard for an employment physical.  *Id.*  Dr. Bouchard's note reflects he found her physically fit to perform a child care job.  *Id.*  Then, apparently after being terminated from the child care position, Plaintiff saw Dr. Bouchard again in October 2008, at which time he counseled her for stress and anxiety about losing her job and other stressors in her life.  (Tr. 349).  Dr. Bouchard referred her to mental health services and encouraged her to move on, noting she had good references from her previous jobs.  *Id.*

Later that month, on October 27, 2008, Plaintiff underwent an adult diagnostic assessment by social worker Robert Bell at Catholic Social Services.  (Tr. 233-38).  Plaintiff reported the precipitating event for seeking services was losing her job and feeling that "every time my life starts to go well something happens to mess it up."  (Tr. 234).  Social worker Bell diagnosed adjustment disorder with anxiety and depression and assessed Plaintiff's current GAF score as 63.[2]  (Tr. 237).  During the mental status examination, Plaintiff exhibited a depressed and anxious mood, but she had normal speech, demeanor, thought content (including absence of suicidal ideation), perception (including absence of hallucinations), and thought process.  (Tr. 238).  She was cooperative and reported no cognitive impairment.  *Id.*  A letter addressed to Plaintiff and contained in the file relates

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 32–34.

2. A GAF rating between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . ." *Id.* at 34.

an alleged occurrence that same day in which Plaintiff and a male companion confronted the director of the day care center where she was previously employed in a way that "was both harassing and threatening," such that the director required medical treatment. (Tr. 148).  The letter further alleges Plaintiff and her companion proceeded to another YMCA branch and then refused to leave the premises when instructed to do so, necessitating a 911 call for assistance.  *Id.*

On November 18, 2008, Plaintiff saw Dr. Bouchard for further follow up after several recent emergency room visits for abdominal and chest pain (Tr. 256–57, 323, 345–46, 384, 495).  Dr. Bouchard noted her report of dizziness and some right upper quadrant discomfort and cramping, which he noted, per her history, was stress related.  *Id.*  He noted her stress had worsened since he last saw her, and she reported she had retained a lawyer, filed an unlawful termination lawsuit against her prior employer, and was surprised the former employer was no longer willing to talk to her about issues in general.  *Id.*  Presumably due to the stress of the deteriorated relationship with her prior employer, Dr. Bouchard advised Plaintiff to "avoid contact with work."  *Id.*

Plaintiff sought mental health treatment in January 2009 at Rakesh Ranjan M.D. & Associates. (Tr. 394-424).  At her intake, Plaintiff mentioned she was upset about losing her job at YMCA Childcare recently, had been the victim of domestic violence, and was currently seeking a restraining order against her boyfriend.  (Tr. 412).  She exhibited rapid speech and racing thoughts, was difficult to redirect, and was suspicious, paranoid, and obsessed with her health.  (Tr. 419).  She was diagnosed with bipolar disorder with psychotic features and assessed with a GAF score of 55. (Tr. 423).

At a follow-up appointment in early February 2009, Plaintiff was paranoid but had no delusions or hallucinations.  (Tr. 402, 405, 408).  She was not taking the psychotropic medication

4

that had been prescribed, even though Dr. Bouchard also encouraged her to use it. (Tr. 537). Plaintiff's refusal to take the medication as directed by her social worker resulted in her discharge from Dr. Ranjan's clinic following her last visit on February 3, 2009.  (Tr. 395, 444-45).

In  February 2009, state agency psychologist Dr. Lewis reviewed the evidence and opined Plaintiff had bipolar disorder mixed with psychotic features and adjustment disorder with anxiety and depression.  (Tr. 432).  She opined Plaintiff was "capable of performing simple to moderately complex routine tasks with no strict production quotas and no fast-paced tasks.  She can manage moderate levels of superficial contact with others, including the public." (Tr. 428).  In July 2009, state agency consultant Dr. Dietz reviewed the evidence and affirmed Dr. Lewis's assessment. (Tr. 524).

In order to obtain an air conditioner for her new apartment, in May 2009, Plaintiff asked Dr. Bouchard for documentation of her shortness of breath on high humidity days.  (Tr. 479).  To accommodate this request, Dr. Bouchard completed an Americans with Disabilities Act Verification of Disability form, in which he checked a box indicating Plaintiff's primary diagnosis qualified her to meet the definition of an individual with a disability.  (Tr. 765).  When asked what major life activities were significantly limited, he elaborated that she had shortness of breath in high humidity, and that Plaintiff's request for an air conditioner was related to her disability.  (Tr. 765-66).  In July 2009, state agency physician Dr. McCloud reviewed the evidence and opined there "continues to be no medically determinable severe physical impairment."  (Tr. 525).

Plaintiff continued to receive mental health treatment from social worker Bell at Catholic Social Services until May 2010, when her care was transferred to therapist Jana Movsesian.  (Tr. 662).  Social worker Bell noted an improved mood and affect by the end of a counseling session in

December 2008.  (Tr. 711).  He also noted Plaintiff relayed that her depression was "a little better" in April 2009, at which time she applied for numerous jobs.  (Tr. 696, 698).  Plaintiff also reported improvement of her depression in August, September, October, and November 2009.  (Tr. 675, 678, 681, 686).  Later treatment records indicated no notable mental status findings.  (Tr. 659, 661, 663-74, 679-80, 684-85, 688, 690-92, 695-703, 706-11, 714-18).  In March 2010, Plaintiff reported an improved self image (Tr. 667) and in May 2010, her mood was stable.  (Tr. 662).

In November 2008 and again in September 2009, social worker Bell sent a form to the University of Akron indicating he expected Plaintiff to have difficulty concentrating and staying focused.  (Tr. 376, 682).  He felt she should be allowed to drop out of her classes.  (Tr. 377, 683).  In his second letter, he also indicated she should focus on her personal issues and alleviate her depression, and then return to college.   (Tr. 683).  In May 2010, social worker Bell completed a form for the Summit County Department of Job & Family Services, in which he indicated Plaintiff was not employable at the present time due to severe anxiety and panic attacks.  (Tr. 762).  He indicated he did not know how long she would be unable to work. *Id.*

In August 2010, therapist Movsesian completed a Mental Impairment Questionnaire, noting she had seen Plaintiff for a total of seven sessions since their first session in May 2010.  (Tr. 733).  She opined Plaintiff had diagnoses of dysthymic disorder with a rule-out diagnosis of bipolar disorder, dependent traits, and a current GAF of 60.  *Id.*  She noted Plaintiff  had made good use of therapy, had not cancelled and was on time for appointments, and seemed more positive and relaxed after sessions.  *Id.*  She felt Plaintiff's prognosis was fair to good with continued counseling for stress and depression management, self-esteem, parenting, and relationship issues.  *Id.*  She assessed Plaintiff's work-related abilities as mostly in the categories "unable to meet competitive standards"

6

or "no useful ability to function." (Tr. 735-36).  She opined Plaintiff would have marked difficulties in maintaining concentration, persistence, or pace (Tr. 737), and could not predict the number of times Plaintiff would be absent each month.  (Tr. 738).

That month, Plaintiff underwent psychological consultation with clinical neuropsychologist Dr. Magleby to determine the degree of psychological or  neuropsychological disability as it pertained to vocational planning.  (Tr. 740).  Plaintiff arrived on time for her appointment without assistance.  (Tr. 741).  Dr. Magleby noted Plaintiff appeared to overreport her mental health symptoms.  (Tr. 742).  Plaintiff claimed she was fired from her child care job at the YMCA because of a parent complaint that was actually about another employee.  *Id.*

During a mental status examination, Dr. Magleby found Plaintiff generally composed and appropriate.  (Tr.743).  Her ability to understand simple language and simple verbal directions appeared to be good, and her ability to understand more complex directions and language was fair. *Id*.  She did not display any overt signs of anxiety.  *Id.*  She reported "vague" hallucinations, which involved seeing spiders and hearing people call her name.  (Tr. 742-43).  She was able to attend to questions, was not markedly distracted or impaired, had fair mental processing speed and response time, and her intelligence was estimated to be in the borderline range.  (Tr. 743-44).  She reported being independent with activities of daily living and appeared to have a fair ability to manage money.  (Tr. 744).

Dr. Magleby administered the Minnesota Multiphasic Personality Inventory-2  (MMPI-2) and indicated the test results "would typically be interpreted as a 'fake bad profile,' or possibly a negative response bias."  (Tr. 746).  He noted "[p]atients who approach the MMPI-2 in this manner may, in fact, have psychiatric problems that are being exaggerated."  *Id.*  He noted Plaintiff "may

7

have responded inconsistently, and possibly, not honestly, to the items on the MMPI-2" and the profile "would be considered invalid for most interpretations." *Id.* He noted "[t]he profile may also be an attempt to exaggerate existing symptoms for some incentive or psychological need." *Id.* Dr. Magleby also noted Plaintiff's scores suggested weakened defensive structures. *Id.* Dr. Magleby concluded Plaintiff's GAF score was 51 (Tr. 748) and Plaintiff was probably a marginal candidate at best for vocational rehabilitation services. (Tr. 749). He opined her work tolerance and interpersonal skills were markedly impaired. (Tr. 750). He further opined she "may be capable of working in a job that does not involve social interaction, multitasking, or divided attention, or time press demands." (Tr. 750).

In August 2010, Dr. Khan at Portage Paths diagnosed Plaintiff with bipolar disorder, not otherwise specified (Tr. 759). Plaintiff cancelled her follow-up appointment at Portage Paths, at which she was supposed to complete the second part of the clinical evaluation. (Tr. 756).

In September 2010, a treating source at the Women's Health Group noted Plaintiff complained of dizziness, palpitations, and elevated blood pressure. (Tr. 781). Plaintiff reported having some family issues and said she went to court that morning, which had made her nervous. *Id.* The treating source felt Plaintiff's symptoms were related to anxiety and advised her to rest and "try to stay away from any stressors as possible over the weekend." *Id.*

Reports to the Agency

Plaintiff reported to the agency that her activities included watching TV, going to church, reading, and playing board and card games. (Tr. 143). She drove a car alone, cooked her own food, and went grocery shopping. (Tr. 142-43). She talked in person or on the phone with others daily and visited her parents' house in Cleveland twice a month. (Tr. 143). She performed household

chores such as cleaning, laundry, ironing, and vacuuming with some help.   (Tr. 198).

<u>The ALJ Hearing</u>

*Plaintiff's Testimony*

Plaintiff testified at some length about her challenges at school and her past jobs (Tr. 35-40), after which the ALJ became concerned she was getting far afield and interrupted her, admonishing her attorney that he would only permit a limited amount of time to "discuss all these past events." (Tr. 41).  The attorney then "cut to the chase," asking Plaintiff why she felt she could not work at that time, to which she replied she was disabled because of her stress, depression, and difficulty controlling her temper.  (Tr. 42).

She described a typical day as waking up at 6:30 a.m., taking medications, helping her children prepare for school, eating, running errands, and cooking.  (Tr. 44-45).  Plaintiff lived with her three minor children, two of whom had disabilities and received disability benefits.  (Tr. 47).  Plaintiff was their representative payee.  *Id.*  She attended teacher-parent conferences for her children and filled out paperwork related to her children's special education needs.  (Tr. 59-60).

Plaintiff testified that the previous summer, she took a bus with her children to Florida to attend a family reunion and went sightseeing, including going to Disney World.  (Tr. 60-61).  She read on her own and to her daughter, and used the internet in public places.  (Tr. 62-63).

Since filing for disability benefits in October 2008, Plaintiff had applied for full-time jobs in customer service and a secretarial position. (Tr. 48-49).

*VE Testimony*

The VE considered a hypothetical person with Plaintiff's vocational characteristics who was able to perform a full range of exertional work with the following nonexertional limitations: must

avoid work environments with hazards such as dangerous machinery or unprotected heights; limited to performing simple and repetitive tasks, but not in a fast-paced production environment such as an assembly line; only superficial interaction with coworkers and supervisors on no more than an occasional basis; and must not be required to communicate with the public as part of the daily job responsibilities.  (Tr. 65-66).[3]  The vocational expert identified numerous jobs such a person could perform, including the representative jobs of cleaner, automobile detailer, and laborer - salvage.  (Tr. 66-67).

ALJ Decision

The ALJ found Plaintiff had not engaged in substantial gainful activity since the application date of October 23, 2008.  (Tr. 18).  He found she suffered from the severe impairment of bipolar disorder, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  *Id.*

In making this determination, the ALJ found moderate restriction in activities of daily living, finding Plaintiff was able, despite being pregnant, to take care of her three children (two of whom have behavioral disabilities), to take the children to school and keep abreast of their school affairs, to apply for jobs, and to cook and do household chores. (Tr. 19).

In social functioning, the ALJ found Plaintiff had moderate difficulties.  *Id.*  He noted her reported difficulty controlling her temper, but also that she was able to adequately take care of her disabled children and their school affairs, had applied for front desk clerk and cashier jobs, and regularly attends church and goes shopping.  *Id.*

---

3. The ALJ incorporated these limitations in his ultimate residual functional capacity finding.  (Tr. 20).

10

He found Plaintiff had moderate difficulties with regard to concentration, persistence, or pace.  *Id.*  In addition to maintaining her household and taking care of her minor children, he noted she uses a computer and reads magazines and the Bible. *Id.*

The ALJ found no episodes of decompensation of extended duration.  *Id.*

In his Residual Functional Capacity ("RFC") determination, the ALJ found Plaintiff has the RFC:

> to perform a full range of work at all exertional levels but with the following nonexertional limitiations: [Plaintiff] is restricted from hazards (such as dangerous machinery and unprotected heights).  She is limited to simple, repetitive tasks not in a fast-paced production environment (i.e. no assembly line work). [Plaintiff] also is limited to occasional, superficial interaction with co-workers and supervisors. [Plaintiff] is restricted from communicating with the public as part of [her] daily job responsibilities.

(Tr. 20).

In making this determination, the ALJ found Plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, but determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC described.  *Id.*  In support of this determination, the ALJ observed Plaintiff was experiencing reasonable stress in her life, but was able to care for her children, managed her finances, was independent in her daily living, shopped, read, and used a computer.  (Tr. 20-21).  He also found her application for cashier and front desk jobs inconsistent with her allegation of disability.  (Tr. 21).

The ALJ considered the opinion of treating physician Bouchard that Plaintiff was disabled and unemployable, but gave that opinion less weight than that of the examining doctors, who found Plaintiff  limited to simple and moderately complex, routine tasks with no fast pace production or

11

strict production quotas and only superficial interaction.  *Id.*  Finding the conclusory determinations of Dr. Bouchard to infringe upon those reserved to the Commissioner, the ALJ further found those opinions to be against substantial evidence in the record showing Plaintiff functioned with her disabled children despite her bipolar disorder diagnosis and her condition was episodic in nature based upon life stressors.  *Id.*

The ALJ gave social worker Bell's opinion that Plaintiff should drop out of her classes limited weight, since he found it did not reflect an assessment of Plaintiff's overall functioning for work and further, was based upon an exacerbation of symptoms due to Plaintiff's life stressors at that point in time.  (Tr. 21-22).

Counselor Movsesian's opinion that Plaintiff had a marked limitation in concentration, persistence or pace was given less weight by the ALJ, where he found it internally inconsistent with the GAF score assigned to Plaintiff.  (Tr. 22).  Similarly, the ALJ found consultative examiner Magleby's opinion that Plaintiff had a marked limitation in work tolerance and interpersonal interaction and was a marginal candidate for vocational rehabilitation to be internally inconsistent with the statement that Plaintiff would be suitable for unskilled work.  *Id.*  The ALJ did find Dr. Magleby's opinions that Plaintiff would be limited from social interaction, multi-tasking, and time demands to be at least partially consistent with the other evidence.  *Id.*

Ultimately, the ALJ determined Plaintiff's RFC leaves her unable to perform her past relevant work.  (Tr. 22).  Considering Plaintiff's age, education, work experience, and RFC, and based on VE testimony, the ALJ determined Plaintiff can perform jobs existing in significant numbers in the national economy.  (Tr. 23).  Thus, he found Plaintiff not disabled.  *Id.*  The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability.  42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).  The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an

13

individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Although her *pro se* filings are somewhat difficult to categorize, collectively, the Court construes Plaintiff's arguments as alleging substantial evidence does not support the ALJ's determination of her RFC, that the ALJ impermissibly dismissed the opinions of her treating physicians and failed to order a medical examination, that she has sustained a Constitutional deprivation and, although not referenced in her Brief on the Merits (Doc. 12), that the Appeals Council should have considered supplemental evidence.

Substantial Evidence Supports The RFC Determination

As Defendant observes, Plaintiff's claim – both at the hearing and in this Court – is founded

14

upon her mental health status.  And although it is not challenged in this action, there was substantial evidence supporting the ALJ's determination that Plaintiff was *physically* capable of performing work at all exertional levels. (Tr. 20).  Thus, the issue for this Court is whether the ALJ's determination of Plaintiff's nonexertional limitations is supported by substantial evidence.  The undersigned finds it was.

The ALJ cited substantial evidence supporting his evaluation of Plaintiff's impairments, including the opinions of the state agency psychological consultants, objective medical evidence, and her activities of daily living.  The ALJ gave "great weight" to the opinions of the state agency psychological consultants, who opined Plaintiff was capable of performing simple to moderately-complex routine tasks with no strict production quotas and no fast-paced tasks and could manage moderate levels of superficial contact with others, including the public.  (Tr. 21, 428, 524). Although Plaintiff complains that Dr. Lewis never examined her (Doc. 12 at 4), agency regulations and rulings expressly recognize the importance of non-examining source opinions, describing these consultants as "highly qualified physicians and psychologists who are also experts in Social Security disability evaluations."  *See* 20 C.F.R. § 416.927(f)(2)(i); *accord* Social Security Ruling ("SSR") 96-6p, 1996 WL 374180.  Thus, the ALJ reasonably relied on the opinions of the state agency psychological consultants when evaluating Plaintiff's limitations.

The ALJ also explained the objective medical evidence was consistent with an ability to perform work within the above limitations.  (Tr. 21).  *See* 20 C.F.R. § 404.1429(c)(2) (explaining objective medical evidence is a "useful indicator" that should be considered in decision-making). The ALJ cited social worker Bell's October 2008 diagnostic assessment, which indicated that other than a depressed and anxious mood, Plaintiff's mental status findings were normal, including normal

15

speech, demeanor, perception (no hallucinations), and thought process, and the absence of suicidal ideation.  (Tr. 238).  Also, Plaintiff was cooperative and reported no cognitive impairment.  (Tr. 238). Similarly, the record reflects that treatment notes of social worker Bell and his colleague frequently indicated no notable mental status findings.  (Tr. 659, 661, 663-74, 679-80, 684-85, 688, 690-92, 695-703, 706-11, 714-18).  Social worker Bell noted improved mood and affect by the end of a counseling session in December 2008.  (Tr. 711).  Plaintiff reported her depression was "a little better" in April 2009 (Tr. 696) and relayed improvement of her depression in August, September, October, and November 2009.  (Tr. 675, 678, 681, 686).  In March 2010, she reported an improved self-image (Tr. 667); and in May 2010, she indicated her mood was stable.  (Tr. 662).  Also, as the ALJ noted, social worker Bell assessed Plaintiff's current GAF as 63, which indicates only mild symptoms.  (Tr. 21, 237); *DSM-IV-TR* at 34.  Similarly, the record reflects that while psychologist Dr. Phillips evaluated Plaintiff's current GAF as 55 in May 2008, Plaintiff's long-term GAF was estimated as 80, which would indicate "no more than slight impairment in social, occupational, or school functioning."  (Tr. 170); *DSM-IV-TR* at 34.  Notably, although not discussed by the ALJ, Plaintiff achieved these gains without the use of psychotropic medications, which Plaintiff declined to take, despite being willing to take medication for her allergies and stomach problems.  (Tr. 395, 404, 444-45, 467, 537).  Thus, the ALJ's evaluation of Plaintiff's limitations was consistent with clinical findings.

In addition, the ALJ explained Plaintiff's activities "indicate[d] that she has not been as limited as she has asserted."  (Tr. 21).  *See* 20 C.F.R. § 416.929(c)(3)(i) (relevance of activities when evaluating pain and functional limitations); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (permitting an ALJ to consider daily activities such as housework and

16

social activities in evaluating complaints of disabling pain).  The ALJ noted that Plaintiff performed household chores, including cooking; took care of three minor children; woke up by 6:30 a.m. to help them get ready for school; drove and went shopping; read; used a computer; went to church; was the representative payee for her two disabled children; attended their school conferences; and filled out paperwork related to their special education needs. (Tr. 21, 44-45, 47, 60, 62-63, 142-43, 198, 744).  Plaintiff reported to Dr. Magleby that she was independent with her activities of daily living, and he observed that she appeared to have a fair ability to manage money. (Tr. 744).

The ALJ also noted Plaintiff traveled by bus to Florida with her children for a family reunion. (Tr. 21, 60-61).  The ALJ discussed that Plaintiff applied for full-time positions, such as jobs in customer service and a secretarial position, suggesting she felt she was capable of performing such jobs. (Tr. 21, 48-49, 698).  The record further reflects Plaintiff visited her parents' house in Cleveland twice a month, talked in person or on the phone with others daily, and regularly attended counseling appointments, arriving on time. (Tr. 143, 733).

Plaintiff alleges her disability arose as a child, citing an incident when she hit her head on a store shelf requiring stitches.  (Doc. 12 at 7-8).  She alleges she struggled through school as a result.  (Doc. 12 at 8).  But Plaintiff's medical records do not attribute her mental impairment to childhood injuries.  Further, testing indicated she did not have any specific learning disorder, and her IQ was in the low-average to average range. (Tr. 169-70).  Similarly, Plaintiff reported to her treating sources that she had no cognitive impairment. (Tr. 238, 402).  Thus, her allegations in this regard were not supported by the record.  In light of Plaintiff's activities of daily living, the opinions of the state agency psychological consultants, and objective medical evidence, the ALJ's evaluation of her impairments and work-related limitations was reasonable and supported by substantial

17

evidence.

<u>The Opinions in the Record Were Weighed by the ALJ</u>

Plaintiff alleges the ALJ did not properly weigh the opinions of her treating doctors and evaluators. (Doc. 12, at 2-5). From a review of the decision, however, it is clear the ALJ gave good reasons for discounting the opinions of Dr. Bouchard, social worker Bell, therapist Movsesian, and consultative psychologist Dr. Magleby. (Tr. 21-22). Thus, he did not err.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(1). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is

nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ.  *Id.*  Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion.  *Id.*  Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).  The "good reasons" an ALJ gives to discount a treating source's opinion must be "supported by the evidence in the case record".  *Id.* at 406–07 (quoting SSR 96-2p, 1996 WL 374188, at *5).  Failing to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243).

*Dr. Bouchard*

In May 2009, Plaintiff asked Dr. Bouchard for documentation that she had shortness of breath on high humidity days  (Tr. 479), and Dr. Bouchard completed an Americans with Disabilities Act Verification of Disability form, indicating Plaintiff's primary diagnosis qualified her for the American with Disabilities Act's definition of an individual with a disability.  (Tr. 765). When asked what major life activities were significantly limited, he elaborated that she had shortness of breath in high humidity, and confirmed that Plaintiff's request for an air conditioner was related to her disability.  (Tr. 765-66).

The ALJ determined Dr. Bouchard's opinion that Plaintiff had a permanent disability was entitled to "less weight" for several reasons. (Tr. 21). First, the ALJ correctly explained that "[s]uch conclusions are left for the Commissioner."  *Id.*; 20 C.F.R. § 416.927(e) (a medical source's statement that a claimant is "disabled" or "unable to work" is an issue "reserved to the Commissioner"). Treating source statements on issues reserved to the Commissioner are "never entitled to controlling weight or special significance." SSR 96-5P, 1996 WL 374183, at *2; see also

19

20 C.F.R. § 416.927(e)(3).  Moreover, the ALJ was not bound by this opinion due to its conclusory nature.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).[4]

Evaluating Dr. Bouchard's opinion, the ALJ found it was "against the substantial evidence, which shows that [Plaintiff] was able to function with her three minor and disabled children despite her diagnosis of bipolar disorder."  (Tr. 21).  The ALJ noted her condition was "episodic in nature" and "based upon life stressors."  *Id.*  Indeed, in October 2008, Dr. Bouchard counseled Plaintiff about her life stressors, but encouraged her to move on, noting that she had good references from her previous jobs.  (Tr. 349).  In addition, as detailed above, Plaintiff was independent in her activities of daily living and frequently exhibited normal mental status findings.  Thus, the ALJ gave good reasons for discounting Dr. Bouchard's opinion of disability and substantial evidence supports his decision to give it less weight.[5]  *See* 20 C.F.R. § 416.927(d)(2) (in order to receive controlling weight, treating physician's opinion cannot be inconsistent with other substantial evidence in the record); 20 C.F.R. § 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

*Social Worker Bell*

Social worker Bell completed forms indicating Plaintiff should be permitted to drop out of college classes due to her mental impairment.  (Tr. 21, 376-77, 682-83).  The ALJ gave "limited

---

4. It is also noteworthy that  disability standards under the Social Security Act differ from those under the Americans with Disabilities Act. *See* 20 C.F.R. § 416.904 ("We must make a disability . . . determination based on social security law.  Therefore, a determination made by another agency that you are disabled . . . is not binding on us.").

5. Further, Dr. Bouchard's statement that Plaintiff was disabled related to the physical impairment of shortness of breath, and Plaintiff has not even challenged the ALJ's findings with respect to physical impairments.

weight" to that opinion, finding it was "based upon an exacerbation of symptoms with [Plaintiff's] current life stressors at that time." (Tr. 22). Indeed, social worker Bell explained Plaintiff should focus on her personal issues and alleviate her depression, after which she could return to college. (Tr. 683). Social worker Bell also submitted a form to the Summit County Department of Job & Family Services in May 2010, indicating Plaintiff was not employable at that time due to severe anxiety and panic attacks, but he did not know how long she would be unable to work. (Tr. 762). Although the ALJ did not mention the latter conclusory assessment, his explanation regarding circumstantial stress would apply to this assessment as well, as Bell only stated an opinion about Plaintiff's current employability. *Id.*

*Therapist Movsesian*

The ALJ explained therapist Movsesian's August 2010 Mental Impairment Questionnaire was due "less weight" because the GAF score of 60 she assessed was "internally inconsistent" with her opinion of marked difficulties in maintaining concentration, persistence, or pace. (Tr. 22, 733, 737). Indeed, a GAF score of 60 corresponds to "moderate symptoms" and is only one point below the next category of only "[s]ome mild symptoms . . . but generally functioning pretty well . . . ." *DSM-IV-TR* at 34. Therapist Movsesian actually felt Plaintiff's prognosis was fair to good with continued counseling. (Tr. 733). Thus, substantial evidence supports the ALJ's conclusion that the extreme limitations in therapist Movsesian's assessment were at odds with her GAF rating. (Tr. 22).

*Dr. Magleby*

Substantial evidence supports the ALJ's conclusion that Dr. Magleby's opinion – stating that Plaintiff had a marked limitation in work tolerance, marked limitation in interpersonal interaction, and was probably a marginal candidate at best for vocational rehabilitation services – was entitled

21

to "less weight because it [wa]s internally inconsistent with [his] statement that unskilled work would be suitable for [Plaintiff]." (Tr. 22, 749-50). Specifically, Dr. Magleby opined Plaintiff "may be capable of working in a job that does not involve social interaction, multi-tasking, or divided attention, or time press demands," which the ALJ noted was consistent with Plaintiff's ability to interact sufficiently to perform activities of daily living and take care of her children. (Tr. 22, 750). Also, the ALJ explained that the GAF score of 51 assessed by Dr. Magleby indicated overall moderate limitations, not marked limitations. (Tr. 748); *see* DSM-IV-TR at 34. In addition, although not discussed by the ALJ, Plaintiff's reports of "vague" hallucinations were at odds with her mental health treatment notes, which consistently documented the absence of delusions and hallucinations. (Tr. 238, 402, 405, 742-43). Therefore, the ALJ gave good reasons explaining the weight he gave to Dr. Magleby's opinion, and he did not err.

<u>There Was No Requirement For A Consultative Examination</u>

Plaintiff asserts she was denied the right to be examined by an agency physician and that a scheduled examination was cancelled. (Doc. 12 at 2, 6-7). There is no basis, however, to conclude it was error for the ALJ to fail to obtain such an examination. Agency regulations explain a consultative examination is required "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim. . . . ." 20 C.F.R. § 416.919a(b). The Sixth Circuit reiterated that "[t]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of HHS*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)). The record reflects the state agency physician found no severe physical impairment (Tr. 525), and the record contained multiple mental health records from

various providers.  Thus, in light of the substantial evidence available for the ALJ to review, the ALJ reasonably exercised his discretion in not procuring additional medical opinions.

<u>Plaintiff Fails to Allege a Colorable Constitutional Claim</u>

A recurring theme in Plaintiff's brief is that her claim was not handled fairly and that she was discriminated against in her own disability determination due to her children already receiving such benefits.  Additionally,  she claims she was not given sufficient time to testify at the hearing.  None of these claims are borne out in the record before the Court, however.

*The Record Does Not Reflect Bias or Prejudice*

As the Sixth Circuit has explained, "courts have long applied the presumption that policymakers with decisionmaking power exercise their power with honesty and integrity." *Navistar Int'l Transp. Corp. v. United  States EPA*, 941 F.2d 1339, 1360 (6th Cir. 1991).  The burden of overcoming the presumption of impartiality belongs to the party making the assertion of bias, and the presumption can be overcome only with convincing evidence that "a risk of actual bias or prejudgment" is present.  *Id.* (citations omitted).  The Sixth Circuit indicated that "any alleged prejudice must be evident from the record and cannot be based on speculation or inference."  *Id.* Plaintiff has not supported her allegations of bias or prejudice with citations to the record or to any other evidence before the Court.  She has thus failed to meet her burden of overcoming the presumption of impartiality.

*The ALJ Did Not Unreasonably Limit Plaintiff's Testimony*

Plaintiff claims she was given a limited amount of time to discuss past events.  A review of the hearing transcript, in its entirety, demonstrates that Plaintiff was given sufficient time to testify. At the beginning of her hearing, after some introductory remarks by the ALJ, the exhibits were

admitted into the record and Plaintiff's counsel made an opening statement.  (Tr. 32-35).  Her

attorney then began Plaintiff's direct examination, which begins at the middle of page 35 of the

Transcript.  In response to questioning from her attorney, Plaintiff testified for several pages of the

transcript about the events surrounding her termination from YMCA Childcare, also testifying about

a lawsuit and bomb threats arising out of hairstyles gone wrong and other misadventures associated

with her tenure as a cosmetologist.  (Tr. 36-40).  At some point, when the stories of Plaintiff's past

became too detailed and too distant from the question of her disability, the ALJ interrupted Plaintiff:

> –I'm sorry to interrupt you. . .You're giving me a lot of details about . . . things that
> have happened to you in the past and I've given your attorney the opportunity to ask
> questions and . . . . –if you want to focus on why you can't work now that would be
> most helpful . . .[C]ounsel, if you really just want to develop all this other testimony,
> I'm only going to give you a limited amount of time to discuss all these past events.

(Tr. 41).

After a brief colloquy between the ALJ and Plaintiff's counsel regarding the relevance of the

testimony which offered, the attorney asked Plaintiff to explain why she felt she could not work, and

she did.  (Tr. 42).  In response to further questioning, she testified about her life activities and

interactions with others.  (Tr. 42-46).  The direct examination continued without further interruption

by the ALJ, concluding with Plaintiff's attorney stating, "I don't have any further questions, your

honor."  (Tr. 46).  Thereafter, the ALJ questioned Plaintiff about her residence, her caring for her

children, her applications for employment subsequent to filing for disability, her interactions with

others, and her ability to shop, drive, travel, and conduct her own affairs.  (Tr. 46-63).  At no time

did the ALJ restrict Plaintiff in her answers to his questions, and when he concluded, Plaintiff's

attorney declined his offer to ask any further questions.  (Tr. 63).

Because the ALJ reasonably allowed Plaintiff's attorney every opportunity to ask any

questions he wished to ask of Plaintiff and the VE, the ALJ did not fail in his duty to develop a fair and full record. *See, e.g., Chandler v. Comm'r of Soc. Sec.*, 124 F. App'x 355, 359 (6th Cir. 2005) (no due process violation where the ALJ gave the plaintiff the opportunity to cross-examine the expert).

The Supplemental Evidence Does Not Warrant Remand

In her Complaint, but nowhere in her brief, Plaintiff claims additional evidence she submitted following the ALJ's decision was relevant to her claim and should have been considered by the Appeals Council. (Doc. 1). However, such evidence "cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citation omitted). When an ALJ renders the final decision of the Commissioner, additional evidence submitted to the Appeals Council may be considered only for the purposes of a sentence six remand. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1233 (6th Cir. 1993). The burden of showing that a remand is proper under Section 405(g) is on the party seeking the remand. *Oliver v. Sec'y of HHS*, 804 F.2d 964, 966 (6th Cir. 1986). A reviewing court may remand a case for consideration of additional evidence if the party seeking remand proves that the additional evidence is new and material and that she had good cause for her failure to incorporate the additional evidence into the record during the administrative hearing. 42 U.S.C. § 405(g); *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *Oliver*, 804 F.2d at 966.

Additional evidence is considered material only if it concerns the claimant's condition prior to the ALJ's hearing decision. *Oliver*, 804 F.2d at 966. Plaintiff submitted to the Appeals Council forms from Dr. Khan dated November 2010, February 2011, and August 2011. (Tr. 4, 825, 827, 830). Plaintiff also submitted emergency room treatment records from February 2011, when she fell

25

on steps in her housing complex and suffered a thoracolumbar contusion, for which she was treated symptomatically.  (Tr. 4, 833).  Because these documents related to Plaintiff's treatment *after* the ALJ's September 2010 decision (Tr. 13-29), they are not material.  Plaintiff therefore fails to demonstrate entitlement to a sentence six remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence.  The undersigned therefore recommends the Commissioner's decision be affirmed.

     s/James R. Knepp, II     
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).